WOODRICH CONSTRUCTION COMPANY v. INDEMNITY
INSURANCE COMPANY OF NORTH AMERICA.
ELMER ZASKE AND OTHERS, THIRD-PARTY DEFENDANTS.

89 N. W. (2d) 412.

March 28, 1958—Nos. 37,175, 37,176, 37,177.

88

*Richards, Janes, Hoke, Montgomery & Cobb,* for appellant Indemnity Insurance Company of North America.

*Ernest A. Rich,* for appellant Milwaukee Automobile Mutual Insurance Company.

*Ray G. Moonan, George A. Lewis,* and *Norman E. Evidon,* for appellant Aetna Casualty & Surety Company.

*Child & Child,* for respondent Woodrich Construction Company.

*Freeman, Peterson, Hoppe & Gaughan,* for respondent Employers Mutual Liability Insurance Company.

MATSON, JUSTICE.

In an action—involving the construction of four insurance policies—brought by plaintiff insured to recover the amount it had paid in settlement of damages based upon an adjudicated liability for accidental injuries, three defendant insurers have each appealed from portions of an order granting or denying (as the case may be) motions for summary judgment.

Plaintiff, Woodrich Construction Company (herein called Woodrich), a general contractor engaged in road construction work, was one of the defendants in an earlier action appealed to this court, namely, Crawford v. Woodrich Const. Co. Inc. 239 Minn. 12, 57 N. W. (2d) 648. In that action, Woodrich and his subcontractor, Walter Baker, and Elmer Zaske, who owned and operated a truck hired by subcontractor Baker, were all sued as defendants by William M. Crawford for damages for personal injuries sustained by him while acting as a state inspector

on a Woodrich road construction job. Crawford was injured while he was making an alignment inspection and the Zaske truck backed over him. In that action the jury awarded plaintiff a verdict for $80,000 against Woodrich only. Upon appeal, the order denying an alternative motion for judgment notwithstanding the verdict or a new trial was affirmed. The Crawford case established as a matter of both fact and law that both Baker and Zaske were exonerated of all negligence and that the sole tortfeasor was Woodrich. The facts out of which the Crawford action arose are set forth in our decision in the Crawford case.

In order to understand the relationship of the parties to the present action, it is necessary to identify the insurers of the defendants in the Crawford case. On June 8, 1950, when the Crawford accident occurred, Woodrich was covered by a comprehensive general liability policy issued by Employers Mutual Liability Insurance Company of Wausau, Wisconsin (herein called Employers). Woodrich was also covered by a comprehensive automobile liability policy issued by Indemnity Insurance Company of North America (herein called Indemnity). Both Employers and Indemnity policies provided for payment up to a $50,000 limit of liability plus costs of defense for a case involving injury to a single person.

The subcontractor, Baker, was insured by Aetna Casualty & Surety Company (Aetna) under a comprehensive automobile liability policy with a limit of $15,000 for injury to a single person plus costs of defense. The driver and owner of the truck, Zaske, was insured under a comprehensive automobile liability policy issued by Milwaukee Automobile Mutual Insurance Company (Milwaukee) with a policy limit of $15,000 plus costs of defense.

Throughout the trial of the case, which finally resulted in a Crawford judgment for $80,000, Employers and Indemnity defended Woodrich, Aetna defended Baker, and Milwaukee defended Zaske. The Crawford case was tried twice. Crawford obtained a verdict in the first trial against Woodrich only, and the trial judge set aside the verdict and granted a new trial. The second trial again resulted in a verdict for Crawford against Woodrich alone. On or about April 7, 1953, the Crawford judgment (which had been entered against Woodrich) was paid by Employers and Woodrich, Employers paying Crawford

$54,882.63 (liability under its policy plus interest) and Woodrich paying Crawford $31,617.37 in satisfaction of the judgment. Indemnity, Aetna, and Milwaukee made no payment on the Crawford judgment, and refused to contribute any portion of the judgment.

This action was commenced by Woodrich to recover on the Indemnity policy for the excess payment made on the Crawford judgment. Indemnity brought in as third-party defendants the subcontractor, Baker, and the truck driver and owner, Zaske, along with their respective insurers, Aetna and Milwaukee. Subsequently, Employers intervened in this action, seeking contribution from Indemnity, Aetna, and Milwaukee for the payment made by Employers on the Crawford judgment, and Woodrich amended its complaint to state a cause of action against Aetna and Milwaukee.

All parties moved for summary judgment. The trial court granted judgment for Baker and Zaske and dismissed them from the action. Indemnity's motion was denied. The motions of Aetna and Milwaukee were denied unless upon subsequent trial they should establish their defenses of lack of notice, lack of cooperation, failure to tender defense, res judicata, and estoppel and waiver. The respective motions of plaintiff Woodrich and Employers, subject to the aforesaid conditional defenses of Aetna and Milwaukee, were granted with the effect that the four insurers, Employers, Indemnity, Aetna, and Milwaukee, were held concurrently liable for the payment of the Crawford judgment in proportion to the limits of their respective policies. The trial court, pursuant to M. S. A. 605.09(4),[1] as a part of its order certified that the questions raised by the order disposing of the motions were important and doubtful. The appeal herein is taken by Indemnity, Aetna, and Milwaukee.

### ISSUES

In passing on the general question of whether the respective policies cover Woodrich's liability in damages to Crawford, and in determining whether such coverage, where it exists, is excess or concurrent, this appeal raises a number of specific issues bearing on the interpretation and construction of the several insurance contracts. (1) First we have

---

[1]See, House v. Hanson, 245 Minn. 466, 72 N. W. (2d) 874.

the basic issue of whether the liability of Woodrich to Crawford in negligence arose from a *use* of an automobile within the coverage of the Indemnity, Aetna, and Milwaukee auto liability polices, or whether such liability arose only from a general business risk covered by the Employers policy. (2) Was Woodrich as a matter of law legally responsible for the *use* of the Zaske truck within the meaning of the policies? (3) Was the Zaske truck, as to Woodrich, a *hired* or a *non-owned automobile* under the Indemnity and Aetna contracts? (4) Is the primary-tortfeasor doctrine applicable herein so as to qualify the liability risk under the Aetna policy or under the policy of any other insurer? (5) May there be an overlapping of liability between a general business risk policy (Employers) and an auto liability policy (Indemnity, Aetna, and Milwaukee)? We have an additional question relating to the propriety of the trial court's order in granting summary judgment subject to a subsequent determination of certain defenses.

## CONTENTION AS TO USE OF TRUCK BY WOODRICH

Under the applicable provisions of their respective policies, Indemnity, Aetna, and Milwaukee contend that the negligence of Woodrich, as a proximate cause of Crawford's injury, related solely to a general business risk and not to a risk arising out of the *use* of an automobile. As a facet of the *absence-of-use* contention, it is specifically urged that the negligent acts or omissions of Woodrich in failing to provide adequate supervision for the backing of the truck in the congested area did not involve an unloading of the Zaske truck and that, separate and independent of an actual unloading activity, such backing of the vehicle could not constitute a use of the truck.

## LEGAL SIGNIFICANCE OF CRAWFORD DECISION AS BEARING ON ISSUE OF USE

In passing on the issue of whether Crawford's injuries resulted from the *use* of an automobile, and not solely from a general business risk, we turn to the legal implications inherent in the Crawford decision (239 Minn. 12, 57 N. W. [2d] 648). In holding that the evidence sustained a finding of negligence on the part of Woodrich and that such negligence was a proximate cause of the accident, we pointed out that

Woodrich exercised control over the turntable, the roller, and the paver in the congested area and assumed a similar control over any truck the moment it entered the area and mounted the turntable to be turned around for its final backing to discharge its load into the paver. The very moment the vehicle entered the congested area the driver became subject to the exclusive control and supervisory direction of Woodrich and its servants. This was borne out by the verdict of the jury which exonerated driver Zaske and subcontractor Baker of any negligence.

We further held that with respect to the exercise of that exclusive control, the evidence sustained a finding of Woodrich's negligence on either or both of two grounds; namely, (1) negligence in the location of the turntable and roller, and (2) negligence in failing to provide adequate supervision for the trucks while they backed up in the congested area. We said (239 Minn. 23, 57 N. W. [2d] 654):

"* * * The evidence sustains a finding that there was no justifiable reason for locating the turntable on the west side or for parking the roller midway between the turntable and the paver. The jury could find that the company, charged with knowledge of these conditions, was not in the exercise of due care when it failed to provide adequate supervision for the trucks as they backed through the congested area under conditions which prevented the truck drivers from observing the men who were working along the west form line. Clearly the failure of the turntable operator, who had a clear view along the west form line to the paver, to warn either the plaintiff or Zaske, the truck driver, of the other's presence could be found to constitute negligence imputable to the company. *Reasonably the turntable operator should not have given the back-up signal until it was safe for the truck to proceed.* We must conclude that there is ample basis for a finding of negligence on the part of the company." (Italics supplied.)

■ In fixing tort liability, negligence is never a material factor unless it is a proximate cause of the accident. Negligence in the location of the turntable and roller could not have been an accident-producing factor in the absence of the backing operation of the Zaske truck. There would have been no accident from the mere mislocation of the turn-

table if the turntable operator, who had a clear view along the west form line to the paver, had not negligently given Zaske a back-up signal while Crawford was still in a position of obvious peril. Clearly, the negligence of Woodrich in the placement of the equipment and his negligence in exercising supervisory control over the truck's movements were inextricably interwoven as concurrent proximate causes of the accident. Any other conclusion can be justified only by putting reality behind a facade of technicality.

### WHAT CONSTITUTES USE OF A MOTOR VEHICLE

■ In assuming exclusive supervisory control of the Zaske truck in the congested area, was Woodrich *using* the vehicle? The broad and common meaning of the word *use* compels an affirmative answer. The *use* of a motor vehicle does not require that the *user, or the user's agent,* be its actual operator. It is common knowledge that the use of a motor vehicle may be furnished by the owner to another with or without a driver. Many decisions have in effect recognized *use* as going beyond the narrow meaning of the direct mechanical operation performed by the driver and as encompassing the broader concept of employing or putting the vehicle into one's service by an act which assumes at any time—with the consent of the owner or his agent—the supervisory control or guidance of its movements.[2] In conformity to these holdings, Black, Law Dictionary (3 ed.) p. 1787, defines *use* as follows: "To make use of, to convert to one's service, to avail one's self of, to employ." We conclude that the moment Woodrich exercised supervisory control over the Zaske truck upon its entrance into the congested area, he employed the truck to carry out his own purpose of constructing a concrete pavement.

■ Without question Woodrich, as the general contractor, assumed

[2]Persellin v. State Auto. Ins. Assn. 75 N. D. 716, 722, 32 N. W. (2d) 644, 647; American Auto. Ins. Co. v. Taylor (N. D. Ill.) 52 F. Supp. 601, 602, 603; Hardware Mutual Cas. Co. v. Mitnick, 180 Md. 604, 26 A. (2d) 393; American Cas. Co. v. Windham (M. D. Ga.) 26 F. Supp. 261, affirmed (5 Cir.) 107 F. (2d) 88; Maryland Cas. Co. v. Tighe (9 Cir.) 115 F. (2d) 297; Red Ball Motor Freight v. Employers Mutual Lia. Ins. Co. (5 Cir.) 189 F. (2d) 374, 377, 378.

control of the truck in the congested area with the consent of subcontractor Baker and of Zaske who owned and drove the truck. Where, as an incident of and in the furtherance of his construction work, a general contractor assumes active control or guidance of a backward movement of a truck provided by a subcontractor, and his negligence in the exercise of that control and guidance is a proximate cause of the accident,[3] the general contractor thereby participates in the operation of the truck to such an extent as to be a *user* of the vehicle. When the general contractor becomes legally obligated to pay damages proximately caused by such a negligent use of the vehicle, he falls within the meaning of insurance contract provisions (here found in the Indemnity, Aetna, and Milwaukee policies) which provide coverage for the insured for all sums which he "shall become legally obligated to pay as damages" for injuries to any person "caused by accident and arising out of the ownership, maintenance or use" of an automobile. In view of our holding that Woodrich's act of assuming control and guidance of the backing movement of the Zaske truck constituted a *use* of the vehicle within the meaning of the above policies, it becomes unnecessary to decide whether such backing movement was a part of an unloading

---

[3]Although the negligence of the general contractor must be a proximate cause of the accident in order to establish his liability in tort for the payment of damages, it does not necessarily follow, *once his liability in damages has been established,* that proximate cause is an essential element to establish coverage under an insurance policy provision which provides that the insurer shall pay, on behalf of the insured, all sums which the latter shall become legally obligated to pay as damages for injuries to any person *caused by accident and arising out of the ownership, maintenance, and use of an automobile.* The contractual words "caused by accident and arising out of" are broad and comprehensive in their meaning. The determination of the scope of coverage and the nature of the peril insured against is dependent upon a proper interpretation of the contract to discover the intent of the contracting parties, and that interpretation is not controlled by tort concepts of liability. See, Schmidt v. Utilities Ins. Co. 353 Mo. 213, 182 S. W. (2d) 181, 154 A. L. R. 1088; Red Ball Motor Freight v. Employers Mutual Lia. Ins. Co. (5 Cir.) 189 F. (2d) 374, 378; Board of Trade Livery Co. v. Georgia Cas. Co. 160 Minn. 490, 200 N. W. 633, 40 A. L. R. 678; 32 Minn. L. Rev. 71; 7 Appleman, Insurance Law and Practice, § 4317; 6 Couch, Insurance, § 1463; footnote 5, *infra.*

operation. That an assumption of control and supervision of a backing movement of a truck, separate and independent of any unloading thereof, may constitute a use within the omnibus provisions of such policies has been recognized by other courts. See, Liberty Mutual Ins. Co. v. Steenberg Const. Co. (8 Cir.) 225 F. (2d) 294.

### OVERLAPPING OF GENERAL RISK AND AUTO RISK POLICIES

■ The classification which places general or comprehensive liability policies covering risks incident to a business operation in a class separate and apart from liability policies covering risks incident to the operation of automobiles furnishes underwriters and others with descriptive tokens of expression which are convenient in designating the type of risk contract involved. In our decisions we have recognized the existence of these two classifications of risk insurance,[4] but in so doing we have not adopted the differentiating classification as establishing a rule of law which precludes the omnibus clause of an auto-liability policy from covering a general business risk or precludes a general-business-risk policy from covering an automobile risk. Since the language of the individual policy controls, it follows that two policies, each representing a different risk classification, may overlap in their coverage when applied to the facts of a particular case. See, Bituminous Cas. Corp. v. Travelers Ins. Co. (D. Minn.) 122 F. Supp. 197. The classification shield of itself affords no protection against liability where the risk in the individual case, regardless of its type, reasonably falls within the intent and meaning of the omnibus clause. This is particularly true in construction work performed by both general and subcontractors, as in the instant case, where it is established as an adjudicated fact that an act of negligence involving general business operations and an act of negligence relating to the operation and use of an automobile are blended together as the proximate cause of a single accident.

### REJECTION OF PRIMARY-TORTFEASOR DOCTRINE

■ Aetna and Milwaukee urge the application of the primary-tort-

[4]See, St. Paul Mercury Ind. Co. v. Standard Acc. Ins. Co. 216 Minn. 103, 110, 11 N. W. (2d) 794, 797; Gamble-Skogmo, Inc. v. St. Paul Mercury Ind. Co. 242 Minn. 91, 108, 64 N. W. (2d) 380, 391.

feasor doctrine which resolves double coverage problems by ascertaining the primary tortfeasor. Usually this is done—

"* * * by reference to the relationship of the insured parties inasmuch as one is immediately liable to the injured party or by reference to the control of the mechanism through which the loss occurs. The insurer, under whose policy the primary tortfeasor is the *named* insured, is then the primary insurer, and is liable to the full limits of its coverage, while the secondary insurer under whose policy the primary tortfeasor is but an additional insured, is liable only for the 'excess' over the other's limits." 38 Minn. L. Rev. 843.

Although some of our decisions in double-coverage situations have spoken of "primary" and "secondary" liability, this court has never expressly adopted the primary-tortfeasor doctrine. An examination of the cases shows that this court has looked to the terms of the insurance contracts to fix liability between competing insurers on the basis of contract interpretation, despite language which, taken by itself, might seem to indicate the primary-tortfeasor rule. In Commercial Cas. Ins. Co. v. Hartford Acc. & Ind. Co. 190 Minn. 528, 530, 252 N. W. 434, 435, 253 N. W. 888, the first Minnesota decision using "primary" and "secondary" language, where the question was between two insurers, one covering a general contractor and the other covering a subcontractor's vehicle which injured a third party, with liability resting upon both insured parties, Mr. Justice Stone said:

"We must determine from the separate contracts whether the insurance was concurrent as to the risk presently involved, or whether one contract furnished primary and the other secondary insurance."

The decision held that the insurance of the general contractor provided only excess coverage, but reached that conclusion only after an analysis and construction of the applicable contract provisions. Contractual interpretation, in resolving double coverage, may result in primary and secondary liabilities but that does not mean that the construction of the contracts has been controlled by the so-called primary-tortfeasor doctrine.

In Gamble-Skogmo, Inc. v. St. Paul Mercury Ind. Co. 242 Minn.

91, 64 N. W. (2d) 380, involving a question of coverage afforded by a general-business-risk policy and two auto-liability policies, there was no application of the primary-tortfeasor doctrine although only the primary tortfeasor was held liable. The decision therein turned upon the unique and controlling adjudicated fact that (although the plaintiff was injured in the course of the assembly of a piece of farm machinery as an essential part of an unloading operation) *the sole act of negligence which proximately caused plaintiff's injury occurred upon the dealer's premises several miles away and was therefore separate and apart from the unloading operation.* The sole act of negligence consisted of the failure of the defendant dealer to instruct its employee, prior to the truck's departure from its premises, as to the proper manner in which to reassemble the machine. This sole act of negligence was held to be too remote from the unloading operation to be a part of the peril or risk insured against under the Hartford and American policies.[5] Clearly decision in the Gamble-Skogmo case was made without any reference to, or application of, the primary-tortfeasor doctrine.

In Eicher v. Universal Underwriters, 250 Minn. 7, 13, 83 N. W. (2d) 895, 899, involving an issue of coverage between the insurer of an employee who was driving and the insurer of the vehicle owned by the employer, the court said:

"The question of division of responsibility between the two insurers is dependent upon a determination as to which policy should be regarded as affording primary coverage * * * and which secondary or excess protection."

In determining the existence of concurrent or excess coverage, the court based its decision on an analysis and comparison of the terms of the respective policies without applying the primary-tortfeasor doctrine to resolve the question of coverage.

█ The application of rules of construction based upon some relatively arbitrary circumstance—such as holding the insurer of the

---

[5]If—where an established liability involved the use or the unloading of an automobile—proximate cause is not a measure of coverage, then it would seem that the remoteness of that proximate cause provided a questionable basis for the Gamble-Skogmo decision. See footnote 3, *supra*.

primary tortfeasor primarily liable; holding the specific insurer liable to the exclusion of the more general insurer; or fixing primary liability upon the insurer first issuing its policy in point of time—brings about a circuity of reasoning and inequitable and confusing results which have little relation to contractual intent or regard for the contractual rights of the parties.[6] In determining the respective liabilities of insurance coverage in cases of overlapping coverage, the decision must rest upon a construction of the language employed by the respective insurers and not upon any so-called primary-tortfeasor doctrine or upon any other arbitrary rule or circumstance.[7] Any language in any of our decisions subject to a contrary interpretation is expressly overruled.

In the light of our rejection of the primary-tortfeasor doctrine, we turn to a consideration of the language used in the different policies to determine the issue of coverage or extent of coverage.

HIRED OR NONOWNED VEHICLE UNDER INDEMNITY POLICY

■ Important to the issue of whether the Indemnity policy provides concurrent or excess coverage is the question of whether the Zaske truck was a *hired* or a *nonowned* automobile as to Woodrich. The policy defines hired and nonowned automobiles as follows:

"* * * (2) Hired Automobile—an automobile *used under contract in behalf of,* or loaned to, *the named insured* provided such automobile is not owned by or registered in the name of * * * (c) an employee or agent of the named insured who is granted an operating allowance of any sort for the use of such automobile; (3) Non-Owned Automobile— any other automobile." (Italics supplied.)

Indemnity asserts that the truck was a hired automobile only as to Baker and a nonowned automobile as to Woodrich. It is argued that any equipment hired, paid for, and regulated by Baker and used by him in the performance of his contract with Woodrich necessarily was used under · contract in behalf of Baker and not Woodrich. The broad

---

[6]See, Oregon Auto. Ins. Co. v. United States F. & G. Co. (9 Cir.) 195 F. (2d) 958; 38 Minn. L. Rev. 838.

[7]See, Zurich General Acc. & Lia. Ins. Co. v. Clamor (7 Cir.) 124 F. (2d) 717, 720; McFarland v. Chicago Exp. (7 Cir.) 200 F. (2d) 5.

definition used in the Indemnity policy does not justify so restricted an interpretation. Clearly Woodrich had the use of the Zaske truck under a contract with Baker. It was under this contract that Baker furnished Woodrich with trucks, whether such trucks were owned or rented for that purpose. There is nothing in the language to indicate that the contract under which the truck was used must run directly from the truckowner to Woodrich as the general contractor.[8] It follows that under the Indemnity contract Woodrich was an additional insured since he used the Zaske truck as a hired automobile under contract and, as a matter of law under the Crawford decision, he was responsible to pay any damages resulting from such use.

### Hired Vehicle Under Aetna Policy

Aetna, subcontractor Baker's insurer, also contends that under its policy the Zaske truck was a nonowned and not a hired automobile as to Woodrich and that therefore its coverage is excess and not concurrent. Aetna's policy defines a hired automobile as *one used under contract in behalf of, or loaned to the named insured, provided such automobile is not owned by or registered in the name of an employee or agent of the named insured who is granted an operating allowance of any sort for the use of such automobile.* Aetna's definition is as broad as that in the Indemnity policy and for the reasons already given we cannot read into that definition a restriction which is not there; namely, that the use of the vehicle under contract does not apply to a user who is not a direct party to the contract. Aetna asserts, however, that under its definition the Zaske truck was, nevertheless, not a hired automobile *on the theory that Zaske,* the truck owner, as an employee or agent of Baker, *was granted an operating allowance for the use of the automobile.* The evidence does not sustain the contention that Zaske was paid an operating allowance. The evidence is that Baker paid Zaske by two separate checks. One check was for his personal services and the other for the use of the truck which had been hired by Baker.

The payment for the use of the truck did not include an operating or expense allowance since Baker's and Zaske's uncontradicted testimony

---

[8]See, Bituminous Cas. Corp. v. Travelers Ins. Co. (D. Minn.) 122 F. Supp. 197.

is that Baker furnished all the oil, gasoline, and repairs for the operation of the batch trucks.[9]

### WOODRICH EMBRACED WITHIN COVERAGE OF MILWAUKEE POLICY

Milwaukee's policy in defining an automobile does not expressly refer to a hired vehicle. Its definition of the word insured is so broad, however, that, in the light of the principles set forth herein, there can be no doubt that, since Woodrich was legally responsible for the use of the truck listed in the policy and was using it with the permission of Zaske, Woodrich is an additional insured under its policy.

### OTHER INSURANCE CLAUSE

■ In the light of the foregoing principles and conclusions we turn to the application of the "other insurance" clause found in each of the four insurer's policies. Employers comprehensive general liability policy contains nothing more than the following unqualified pro-rata provision:

"12.  Other Insurance

"If the insured has other insurance against a loss covered by this policy the company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the Declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss."

The comprehensive auto liability policies of Indemnity, Aetna, and Milwaukee each in their "other insurance" clause have the same pro-rata provision, word for word, as Employers but follow the same with a proviso which eliminates nonowned automobiles from coverage under the pro-rata clause and in lieu thereof substitutes excess coverage for nonowned vehicles.

In construing the "other insurance" clauses we have, however, the interesting contention that such clause as found in the Indemnity policy refers only to other insurance purchased by the named insured, Woodrich. This contention is wholly without merit. The word *insured* as used therein is neither qualified by the word *named* nor is it other-

---

[9]See, p. 181, f. 3; p. 182, f. 1; p. 198, ff. 1 and 2; and p. 202, f. 2, of the record in instant case. Also see, p. 705, f. 3, and p. 706, f. 1, of the record in Crawford v. Woodrich Const. Co. Inc. *supra.*

wise restricted in meaning by its context. It is also significant that the Indemnity policy defines the unqualified word *insured,* for the purpose of coverage, as including not only the *named insured* but also *any person or organization legally responsible for the use of the automobile.* If we were to hold that the "other insurance" clause refers only to other insurance carried by the named insured, we would be putting conditions into the "other insurance" clauses which the appellant companies could have written, but did not write, into their policies.[10] In the absence of restrictive or qualifying language the word *insured* as used in an "other insurance" clause is, in accord with the holding of most courts,[11] to be given a broad and liberal meaning whereby the clause embraces *any other valid and collectible insurance,* irrespective of whether such other insurance was procured by persons other than the named insured.

It follows that the trial court did not err in its conclusions that Employers, Indemnity, Aetna, and Milwaukee are concurrently liable and that each under its policy must pay, in proportion to the limits of the respective policies, a share of the damages and defense expenditures fixed by entry of the Crawford judgment. All the policies herein contain the usual defense-and-settlement clause whereby the insured agrees to defend, in behalf of the insured, any suit brought against the latter for damages covered by the policy even though the suit may be groundless, false, or fraudulent.

---

[10]Examples of such restrictive "other insurance" clauses may be found in New Amsterdam Cas. Co. v. Hartford Acc. & Ind. Co. (W. D. Ky.) 18 F. Supp. 707; Penn v. National Union Ind. Co. (5 Cir.) 68 F. (2d) 567.

[11]See, Traders & General Ins. Co. v. Pacific Employers Ins. Co. 130 Cal. App. (2d) 158, 164, 278 P. (2d) 493, 498; McFarland v. Chicago Exp. (7 Cir.) 200 F. (2d) 5; Peerless Cas. Co. v. Continental Cas. Co. 144 Cal. App. (2d) 617, 301 P. (2d) 602; Celina Mutual Cas. Co. v. Citizens Cas. Co. 194 Md. 236, 71 A. (2d) 20, 21 A. L. R. (2d) 605. But see Bituminous Cas. Corp. v. Travelers Ins. Co. (D. Minn.) 122 F. Supp. 197, 203, wherein it is held that the other insurance clause in the Bituminous policy issued to the Quarry Company as the named insured referred only to other insurance purchased by said company. The *other* insurance available to the Quarry Company was the Travelers policy which had been purchased by the wife of the driver of the truck (the truck was registered in her name). The corresponding other insurance clause in the Travelers policy was given effect because the Quarry Company was covered by other (Bituminous) insurance.

In view of the matters established as a matter of law under our decision in Crawford v. Woodrich Const. Co. Inc. 239 Minn. 12, 57 N. W. (2d) 648, the trial court did not err in denying Indemnity's motion for summary judgment, and in granting the other motions for summary judgment (subject to the reservation for future determination of special defenses raised by Aetna and Milwaukee) whereby Employers, Indemnity, Aetna, and Milwaukee were all held concurrently liable for the payment of the Crawford judgment in proportion to the limits of their policies. Except as to the special defenses which were properly reserved for future determination under Rules of Civil Procedure, Rule 56.04, there were no facts in dispute and only questions of law were involved.

The order of the trial court is affirmed.

Affirmed.